**Ruth PARKS, individually and for all others similarly situated, Plaintiff,**

v.

**Richard HARDEN, individually and as the Commissioner of the Department of Human Resources, Defendant.**

**Civ. A. No. 17504.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Jan. 4, 1973.

Steven Gottlieb, Alfred C. Kammer, Atlanta Legal Aid Society, Inc., Atlanta, Ga., for plaintiff.

Dorthy Kirkley, Asst. Atty. Gen., Atlanta, Ga., for defendant.

SIDNEY O. SMITH, Jr., District Judge.

This case presents very narrow and difficult questions of legislative and administrative construction. The plaintiff in this class action represents prospective mothers "the fact of whose pregnancy has been determined by medical diagnosis." As such, the action is brought seeking declaratory and injunctive relief on behalf of such unborn children as would otherwise be entitled to Aid For Dependent Children ("AFDC") if in life under the state public welfare assistance plan, promulgated and approved under the Federal Social Security Act. 42 U.S.C. § 502ff. In essence, the plaintiff insists that an "unborn child" is a "dependent child" under 42 U.S.C. § 606(a) [1] and therefore entitled as a matter of right to such assistance, while

---

1. Which provides:

(a) The term "dependent child" means a needy child (1) who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece, in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of eighteen, or (B) under the age of twenty-one and (as determined

Georgia's plan does not provide for such benefits.

In practical terms, the issue is significant. There can be no question that, in terms of need and dependency, many unborn children are in far more severe circumstances than born children, who, at least, have the possibility of an active mother capable of assisting in their care and support. However, in terms of the overall programs, the effect of adding such group to the rolls of recipients is great. An estimate, based on a count of current infants "born into welfare" indicates a total annual cost to the state of 2.3 million dollars out of a proposed new budget of 141 million. The result of inclusion into the program would, with federal contributions, reduce aid to current recipients by some 6.8 million. Considering the already marginal level of welfare subsistence in the AFDC program, the effect on some current recipients would indeed be damaging. Thus, the decision is difficult both by legal standards and in factual results.

Distressingly, the case presents yet another instance in which the federal agency involved, HEW, has failed to utilize its powers to resolve such issues in the first instance with national uniformity. See Lewis v. Martin, 397 U.S. 552 at 560, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970) (dissenting opinion). Instead, HEW has approved and funded some 19 state plans providing for aid to unborn children and some 40-odd without such aid. This continued default in the establishment of a uniform regulatory scheme has cast unnecessary burdens on the federal courts as the varying state plans are attacked piecemeal. The already tardy response of appropriate amendments to the regulations to conform with Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971) and Carleson v. Remillard, 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972) is but an example of continued administrative indirection.

For jurisdictional purposes, the constitutional issues are deemed insubstantial by the parties so as not to require the convening of a three-judge court. Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). The real contest is whether the state scheme conflicts with the federal regulations or statute. In this respect, the plaintiff advances two main arguments, which while intertwined proceed along slightly different lines.

 (1) It is now axiomatic that 42 U.S.C. § 602(a)(10) places on each state participating in the AFDC program the requirement that aid to families with dependent children shall be furnished with reasonable promptness to all *eligible* individuals. "Eligibility" so defined, must be measured by federal, not state, standards. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); Carleson v. Remillard, 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972). The HEW regulations provide, in part, that:

"(2) Federal financial participation is available in:

. . . . . .

(ii) Payments with respect to an unborn child when the fact of pregnancy has been determined by medical diagnosis;" [45 CFR § 233.90(c)(2)(ii)].

 Therefore, it is simplistically argued that, since HEW permits payments to unborn children they therefore become "eligible individuals" and entitled to benefits. Stated differently, the inclusion of such a class in the regulations ipso facto renders payments to them mandatory.

However, there is a distinction within the regulations themselves. Each regu-

---

by the State in accordance with standards prescribed by the Secretary) a student regularly attending a school, college, or university, or regularly attending a course of vocational or tech-

nical training designed to fit him for gainful employment; . . .
For other purposes §§ 607 and 608 expand the definition of dependency.

lation covering the various categories of relief is divided into two main parts: (a) "State plan requirements" and (b) "federal financial participation." Ordinarily (a) are considered as prerequisites and (b) as optional. See 45 CFR § 233.10. However, even within the latter category there is a significant distinction. In § 233.90 there are two subparts to "federal financial participation." Part (c)(1) states that "Federal financial participation—with respect to a 'dependent child'—is available *within the following interpretations:*" (Emphasis supplied). There follows a listing of those categories defining a "needy child" common to all programs. The state concedes that any plan which sought to vary these standards would be improper. However, Part (c)(2) states simply that "Federal financial participation is available in:". There follows a listing of available benefits, including the unborn child. The court is inclined to the view that (c)(2) refers only to optional coverage under a plan. The regulations themselves grant wide discretion to the states in affording coverage. § 233.10(a). HEW itself has consistently considered the unborn child program to be optional. A reading of the recent Supreme Court decisions leads to the conclusion that mere inclusion in the regulations does not in itself require the payment of benefits. That states still have latitude in their choice of programs is evident.[2] However, if any program is once adopted, the state plan must meet minimal federal standards of coverage within the program. By this same approach, if Georgia should adopt the unborn child program it could not substitute another standard for that of "when the fact of pregnancy has been determined by medical diagnosis." However, the regulations themselves do not require the inclusion of the unborn child as a mandatory recipient.

More importantly, an examination of the cases relied on reveal that the rulings were bottomed not on a variance between the state plan and the HEW regulations, but on a variance between the state standard and the Act of Congress itself. Thus while some reliance was placed on administrative interpretation in *King*, the ultimate holding was that Alabama's "substitute parent" regulation conflicted with Congress's definition of "parent" in 42 U.S.C. § 606(a)(1). Similarly, the Illinois proscription against aid to 18–20 year old college students was held to be at variance with the plain language of 42 U.S.C. § 606(a)(2)(B) in *Townsend*. Finally, in *Carleson*, California's exclusion of military personnel was held to violate the definition of "continued absence" in 42 U.S.C. § 606(a)(1). In each instance, the result came about through an ascertainable variance between the state standard and that expressed in the language of the statute as adopted by the Congress. The administrative process had little if anything to do with the result. In fact, the HEW policy of liberal approval was inferentially countermanded by the court in *Carleson*. Thus, it is concluded that adoption of the HEW regulation § 233.90(c)(2)(ii) on the unborn child does not in and of itself mandate payment.

■ (2)(a) This leads to the second and more difficult question: namely, that of Congressional intent. Plaintiff argues that "unborn child" is necessarily included in the phrase "dependent child" in 42 U.S.C. § 606. Of course, if this be true, the omission would be in conflict with the statute itself and the results would conform to the cases discussed.

As a matter of semantics, there simply is no way to conclude that the word "child" includes something else which is not a "child," namely an unborn child. In legal terms, the unborn child is nor-

2. See particularly in this regard Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); Carleson v. Remillard, 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972).

mally referred to as a fetus, or "quick", or *in utero* and the court knows of no cases which confer a legal right on an unborn child as such, but they grant rights to them or the mother only if born alive, or in the status as thus modified.[3] The federal statute does not, then, specifically address the question of whether or not the child whose dependency forms the basis of Federally matched assistance can be an unborn child.

The court is, therefore, relegated to the Herculean task of seeking to ascertain Congressional intent through legislative history. This is especially difficult in the welfare area. See Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Jefferson v. Hackney, 406 U.S. 535, at 567, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972) (Marshall, dissenting opinion). A thorough search by the court and counsel has revealed little of real value in this regard. There is apparently no clear indication of Congressional intent with respect to this issue in the Committee reports or floor debates on the original Social Security Act of 1935 nor the subsequent amendments, and the matter received no direct legislative attention until the recent 92nd Congress. However, the Senate report in 1935 speaks in terms of direct aid to growing children. Senate Com-

mittee Report, S.Rep. No. 628, 74th Cong. (1st Sess.). Further, it should be noted that the definitions of "dependent child" in the original Act and the 1939 amendment [4] talked only in terms of payment with respect to the needs of a child and not for assistance payments made on behalf of the mother or other adult relative. Not until the 1950 amendments was the law changed to provide for Federal matching of payments designed to meet the needs of the adult caretaker of a dependent child. In the 92nd Congress (1971–72), the question was directly considered in connection with H.R. 1. Senate Committee Report No. 92–1230 reveals that the practice in some states (17 plus Guam and District of Columbia) of making payments for the benefit of unborn children had come to the attention of the Congress, and both houses adopted proposed amendments which would prohibit the practice by a specific revision of 42 U.S.C. § 606(a) to provide "The term 'dependent child' means a needy child *who has been born* and (1) who has been deprived of parental support _ _ _ _ _ _." However, the Conference Committee eliminated all the provisions of H.R. 1 dealing with welfare for families, leaving the AFDC program unchanged. In candor, the court does not know the worth of this action in determining intent either way, except to say that Con-

---

3. E. g. Hornbuckle v. Plantation Pipeline Co., 212 Ga. 504, 93 S.E.2d 727 (1946); Porter v. Lassiter, 91 Ga.App. 712, 87 S.E.2d 100 (1955).

4. 1935 Act—
 "Sec. 406. When used in this title—
 (a) The term 'dependent child' means a child under the age of sixteen who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, or aunt, in a place of residence maintained by one or more of such relatives as his or their own home;
 (b) The term 'aid to dependent children' means money payments with

respect to a dependent child or dependent children."
1939 Act—
 "Sec 403. Section 406(a) of such Act is amended to read as follows: '(a) The term "dependent child" means a needy child under the age of sixteen, or under the age of eighteen if found by the State agency to be regularly attending school, who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, or aunt, in a place of residence maintained by one or more of such relatives as his or their own home'."

gress apparently recognized the unborn child program as optional in practice.

Looking elsewhere in the Act, the court is persuaded that mandatory coverage was not specifically intended in the original or subsequent amendments. First of all, as noted, such coverage is not specifically required by 42 U.S.C. § 606(a) which is the basis for all AFDC qualifications and heavily relied upon by the Supreme Court. Conversely, 42 U. S.C. § 602(a), (b) purports to set out the mandatory requirements for all state plans. Unborn child coverage is not a requisite therein nor in the penalties section. 42 U.S.C. § 604. Additionally, for purposes of another HEW program, Old-Age, Survivors and Disability Insurance, an unborn child is apparently excluded from coverage. See 42 U.S.C. § 416(e) (wherein a stepchild is bound by a nine months rule and an adopted child is referred to as living). 42 U.S.C. § 402(d) also apparently presupposes life in order to qualify. As these statutes have been repeatedly amended by the Congress, the failure to include unborn children specifically may be of importance. On balance, the court finds that there is no basis in the statute itself nor in the legislative history to conclude that an unborn child is included in the definition of "dependent child."

■ (2)(b) Finally, there is consideration of the administrative regulation in terms of its effect on the statute itself. As a rule of statutory construction, deference is due the interpretation given the Act by the agency charged with its administration. "[A]dministrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful." Norwegian Nitrogen Prod. Co. v. United States, 288 U.S. 294, 53 S. Ct. 350, 77 L.Ed. 796 (1933); United States v. Leslie Salt Co., 350 U.S. 383, 76 S.Ct. 416, 100 L.Ed. 441 (1956). This reasoning has specifically been applied in the welfare area. Lewis v. Martin, 397 U.S. 552 at 559, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970). Of course, it must yield to the clear intent of the Congress. Cf. Carleson v. Remillard, 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972). Were the issue here the question of whether a state *may* choose *to afford such coverage, the court would so rule on this basis.* While the practice did not reach the regulations proper until 1971 (36 F.R. 3897, Feb. 27, 1971), assistance for an unborn child has been permitted by the "Handbook of Public Assistance Administration" issued by the agency since as early as 1946.[5] This practice, unchallenged by the Congress for 25 years, would preponderate toward such a conclusion, absent some affirmative action such as adoption of the amended H.R. 1 by the 92nd Congress. However, the weight of such agency practice on the question at hand— whether assistance for the unborn child *must* be afforded coverage—is cancelled out by the equal HEW policy of making

5. The inclusion of the policy of allowing payments to an unborn child originated in an audit exception to payments made by the State of Wisconsin for the benefit of a child "from six months before to six months after the birth of the child" under its preexisting 1931 state program. In a transmittal to the Social Security Board, the Director of Public Assistance in 1941 recommended that "federal participation —be extended on behalf of unborn children to those states which include provisions for unborn children within the scope of aid to dependent children." On July 15, 1941, the minutes recite: "No formal policy was enunciated at this time, but the Board directed that the audit ex-

ception taken in Wisconsin to assistance payments made under Aid to Dependent Children program in behalf of unborn children should be waived, and it was understood exceptions would not be taken to such payments in the future." The court assumes the practice became formal policy by the inclusion in the 1946 Handbook. A reading of the transmittal and all available administrative documents clearly indicate that the unborn child program was considered optional. In fact, it was predicted that only one state, Wisconsin, would immediately avail itself of the program. The administrative genesis was, therefore, always on the optional basis.

such a program optional. Thus, the legitimate result of such considerations is to leave standing the entire policy as interpreted by HEW to the effect that such assistance *may* be granted with federal matching funds, but in the discretion of the contracting state.

In summary, the court has found that inclusion of an unborn child in the coverage afforded a "dependent child" under 42 U.S.C. § 606(a) is not required by the Supreme Court decisions, by the legislative intent, nor by administrative practice. The last named allows such coverage, but under the optional power granted the states by the Congress.

It is well-recognized that the purposes of AFDC are to provide for those in genuine need. As a matter of policy, the court sees nothing inconsistent with aid for the unborn child and the aim of Congress. See 42 U.S.C. § 601. In fact, as a matter of personal preference, the court would like to see such coverage afforded on some basis and hopes Georgia can do so on its own. However, such worthwhile aim is better accomplished by Congressional direction or by state legislation than by judicial overreach. As has been stated before, "We do not decide today that the [state law] is wise, that it best fulfills the relevant social and economic objectives that [the State] might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. . . . [T]he Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." Dandridge v. Williams, 397 U.S. 471 at 487, 90 S.Ct. 1153 at 1162, 25 L.Ed.2d 491 (1970) ; Jefferson v. Hackney, 406 U.S.

535 at 551, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972).

For the reasons stated, the temporary restraining order orally entered by the court is dissolved and the petition is denied and dismissed.

It is so ordered.