Arlene L. CARVER and Gloria Fowler, Individually and on behalf of their unborn children, and on behalf of all others similarly situated,

v.

Thomas L. HOOKER, Individually and as Director of the New Hampshire Division of Welfare.

Civ. A. No. 73–87.

United States District Court,
D. New Hampshire.

Nov. 30, 1973.

John W. Cotton, N. H. Legal Assistance, Keene, N. H., for plaintiff.

John T. Pappas, Concord, N. H., for defendant.

## OPINION

BOWNES, District Judge.

This is another in the line of recent cases alleging that certain state

welfare practices are in conflict with federal law and the United States Constitution. *See* King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); Carleson v. Remillard, 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972); and *see, e. g.,* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L. Ed.2d 442 (1970); Dandridge v. Williams, 397 U.S. 441, 90 S.Ct. 1153, 25 L. Ed.2d 491 (1970); Lewis v. Martin, 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); and Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971). In this instance, pregnant women,[1] who are otherwise childless,[2] challenge the practice of the New Hampshire Department of Welfare (hereinafter defendant) in denying them benefits under the Aid for Families with Dependent Children (hereinafter AFDC) program of the Social Security Act, 42 U.S.C. § 601 et seq., as amended. Jurisdiction is based on 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3), 28 U.S.C. §§ 2201 and 2202, and 28 U.S.C. §§ 2281 and 2282.[3]

On April 24, 1973, plaintiffs filed a complaint claiming that the defendant's practice of denying them benefits was "in conflict with provisions contained in the Fourth and Fourteenth Amendments of the Constitution of the United States as well as the Social Security Act and regulations promulgated pursuant to it." The complaint prayed, *inter alia,* that this court convene a three-judge court, and/or determine the statutory issue for itself, and issue a temporary restraining order. The requested relief is a declaratory judgment declaring defendant's practice illegal, preliminary and permanent injunctions restraining defendant from further denying plaintiffs' AFDC benefits and damages equal to the retroactive benefits withheld as of the date of plaintiffs' applications for AFDC. On June 18, 1973, this court denied plaintiffs' motion for a temporary restraining order on the grounds that there was no proof of irreparable injury. At that time it appeared that both plaintiffs were receiving adequate support through the State's general assistance program.[4]

Inasmuch as plaintiffs are attempting "to interdict a statewide statutory scheme," a three-judge court was convened pursuant to 28 U.S.C. § 2281. Americans United v. Paire, 475 F.2d 462, 465 (1st Cir. 1973); *see* King v. Smith, *supra,* Townsend v. Swank, *supra,* and Carleson v. Remillard, *supra.* However, on September 19, 1973, the three-judge court returned the case to this court to consider

[p]etitioners' statutory claim that the distinction made between born and unborn children is in conflict with the Federal Social Security Act, and any related nonconstitutional questions . . . .[5]

## I. PROPRIETY OF DECIDING THE STATUTORY ISSUE

Of late, a fair body of law has grown up legitimizing the practice of a prefatory decision by a single judge on Supremacy Clause issues in cases involv-

---

1. Since the rights of the pregnant women coincide with the rights of the unborn children in this case, mention of the one will include the other.

2. *See* notes 16–22 *infra* and accompanying text.

3. This court's jurisdiction is not contested by the parties. *See* Defendant's Answer, Paragraph 2. However, as jurisdiction may not be conferred by the parties, I have examined the issue *sua sponte,* and I find that this court does have jurisdiction to hear this

case. *See* Doe v. Lukhard, 363 F.Supp. 823 (E.D.Va.1973); Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed. 2d 424 (1972).

4. NH RSA 165, entitled Aid to Town Paupers. *See particularly,* 165:1.

5. The order provided that the three-judge court would retain jurisdiction "as to petitioners' separate claim that such distinction violates the United States Constitution." Order of September 19, 1973.

ing challenges of state welfare practices based on both federal statutes and the Constitution where determination of that issue could be dispositive of the entire case. The availability of this procedure was recognized in King v. Smith, but the Court specifically left open the question of its propriety.[6] In Rosado v. Wyman, *supra*, a three-judge court was convened to hear petitioner's claim that state welfare laws were in conflict with the Social Security Act and the Equal Protection Clause of the Fourteenth Amendment.[7] Before a decision was reached, the equal protection issue was mooted, and the three-judge court dissolved itself and remanded the case to Judge Weinstein[8] "for such further proceedings as are appropriate." Rosado v. Wyman, 397 U.S. at 400, 90 S.Ct. 1207, at 1211, 25 L.Ed.2d 442. On the basis of the federal statutory claim, Judge Weinstein issued a preliminary injunction against the Welfare Department. An interlocutory appeal was taken, and on review of the Second Circuit's reversal, the Supreme Court was presented initially with the question of whether a single judge had subject matter jurisdiction to decide the statutory issue. In deciding that a single judge did have jurisdiction under the *Rosado* circumstances, the Court noted:

Even had the constitutional claim not been declared moot, the most appropriate course may well have been to remand to the single district judge for findings and the determination of the statutory claim rather than encumber the district court, at a time when district court calendars are overburdened, by consuming the time of three federal judges in a matter that was not required to be determined by a three-judge court. See Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). 397 U.S. at 403, 90 S.Ct. at 1213, 25 L.Ed.2d 442.

This language is particularly appropriate here. If a single judge can determine Supremacy Clause issues on remand from a dissolved three-judge court, certainly he can determine those issues where the three-judge court has retained jurisdiction. And this has been made clear by the Court's *per curiam* decision in Wyman v. Rothstein, 398 U.S. 275, 90 S.Ct. 1582, 26 L.Ed.2d 218 (1970). In Wyman v. Rothstein, a three-judge court had decided the challenge to a state welfare statute on constitutional grounds, finding it "unnecessary to consider appellees' statutory claims." 398 U.S. at 276, 90 S.Ct. at 1582. The judgment was vacated and the case remanded in light of *Rosado* which the Court said established that:

a federal court called upon to pass upon the constitutional validity of a State's welfare program should, before reaching the constitutional issues, consider first any pendent statutory claims that are presented. 398 U.S. at 276, 90 S.Ct. at 1583.

Moreover, a number of lower courts have recently followed this sensible time-saving practice.[9]

---

6. The Court said:
  We intimate no views as to whether and under what circumstances suits challenging state AFDC provisions only on the ground that they are inconsistent with the federal statute may be brought in federal courts. 392 U.S. at 312 n. 3, 88 S.Ct. 2128 at 2131, 20 L.Ed.2d 1118.

7. King v. Smith clearly established that a three-judge court has jurisdiction to consider the statutory claims and, indeed, is "obliged to adjudicate . . . [the] statutory claim in preference to deciding the . . . constitutional claim. Rosado v. Wyman, 397 U.S. 397, 402, 90 S.Ct. 1207, 1212, 25 L.Ed.2d 442 (1970).

8. Judge Weinstein was the single judge to whom the complaint was originally presented.

9. *See* Wilson v. Weaver, 358 F.Supp. 1147 (N.D.Ill.1972); Connecticut Union of Welfare Employees v. White, 55 F.R.D. 481 (D.Conn.1972); Parks v. Harden, 354 F. Supp. 620 (N.D.Ga.1973); Young v. Harder, 361 F.Supp. 64 (D.Kan.1973); Alcala v. Burns, 362 F.Supp. 180 (S.D.Iowa1973); Doe v. Lukhard, 363 F.Supp. 823 (E.D.Va. 1973). Cf. Americans United v. Paire, 348 F.Supp. 506 (D.N.H.1972), *rev'd*, 475 F.2d 462 (1st Cir. 1973), *remanded*, 359 F.Supp. 505 (D.N.H.1973).

## II. THE FACTUAL SETTING

The facts have been stipulated. Plaintiffs are pregnant women [10] who do not have other children living at home with them.[11] Plaintiffs will qualify for AFDC benefits under defendant's practice as soon as their children are born; they would qualify now, except that the defendant denies AFDC benefits unless there is a postpartum child living at home with the mother. In other words, plaintiffs qualify for AFDC benefits in all respects, except with regard to the prerequisites being challenged here.

The only evidence adduced at the hearing concerned the importance of prenatal care. Dr. Howard N. Jacobson, an expert in the field of maternal and infant nutrition, testified, and I find, that prenatal nutrition, and to a lesser extent, prenatal medical care, is a major determinant of infant birthweight, which is in turn directly related to later susceptibility to disease, neurological problems and long-term learning capacity.[12]  Dr. Jacobson further testified that, absent AFDC benefits, it was "highly unlikely" that a mother could be assured of an adequate nutritional intake based on the State food allowances available to pregnant women.[13] I accept this testimony.

## III. THE LEGAL SETTING

Aid to Families with Dependent Children is one of the categorical public assistance programs established by the Social Security Act of 1935 and continued to the present by various amendments to that Act. The topography of the AFDC program has been mapped out in many recent decisions [14] and need not be retraced in detail here. Basically, the AFDC program is a State-administered matching funds scheme which provides aid to needy families with dependent children. Although states need not participate in the AFDC program,[15] 42 U.S.C. § 601, New Hampshire has chosen to do so. See NH RSA 167.

The basis for the complaint here is that, under defendant's interpretation of

And as a practical matter, this approach makes sense, as the court in *White, supra,* noted:

A possible hazard of such a practice is that there may be duplication of effort if it subsequently develops that the nonconstitutional issues are not dispositive and that a three-judge court is needed. . . . The choice is between the risk of wasting the time of two potential members of the three-judge court on matters that might never require their consideration, or the risk of wasting the time of the single judge (and the parties) in relitigating some matters a second time. The latter risk can usually be substantially moderated by the judicious use of the record already made before the single judge . . . . Moreover, such an approach enables a court to adhere to the policy of considering nonconstitutional issues in advance of constitutional issues. 55 F.R.D. 481, 485.

10. Plaintiffs' "pregnancy has been determined by medical diagnosis." They are thus in compliance with the federal regulation governing aid to unborn children. 45 C.F.R. § 233.90(c)(2)(ii).

11. Plaintiff Carver did have another child, Vickie Starr Carver, but Vickie has been given up for adoption.

12. In Alcala v. Burns, 362 F.Supp. 180 (S.D.Iowa1973), the court found as a fact that:
. . . the nutrition of a mother during pregnancy is an important determinant of the health and condition of the child and that there is a substantial likelihood that the health of a child may be adversely affected as a result of the pregnant mother's inadequate nutrition. . . . [and] that proper medical attention during pregnancy is important to protect the mother's health, which in turn affects the health and development of the child.

13. It was stipulated that, under the New Hampshire General Assistance Program, plaintiff Carver received $11.00 per week for food and plaintiff Fowler received $8.00 per week for food.

14. See King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Rosado v. Wyman, 397 U.S. 397 at 408 n. 11, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) and accompanying text and the cases cited therein. See also Comment, AFDC Eligibility Requirements Unrelated to Need: The Impact of King v. Smith, 118 U.Pa.L.Rev. 1219 (1970).

15. It must be recognized that, practically speaking, state participation is not economically voluntary, given the necessity of obtaining federal matching funds.

NH RSA 167:6(V) and section 2033 of the Manual of Policies, Public Assistance of the New Hampshire Division of Welfare, pregnant women who are otherwise childless are not entitled to AFDC benefits until the child is born. Defendant argues that it uniformly denies aid to unborn children [16] and that such a policy is authorized by and consistent with HEW regulations. In this manner defendant attempts to bring this action squarely into line with a number of recent cases which have considered the question of whether or not an unborn child is included in the statutory definition of "dependent child." 42 U.S.C. § 606(a). These cases,[17] although analogous to the present controversy, differ in at least one significant aspect. In all of the cases, as far as I can tell,[18] the States completely denied AFDC to *all* unborn children. This practice allowed the state-defendants to argue that the entire unborn children program was optional under the appropriate HEW regulations [19] and that, since they did not recognize unborn children as children, they had chosen not to participate in the program. Those courts that found pregnant women entitled to AFDC benefits [20] had to circumvent the usual deference paid to longstanding administrative interpretation [21] via the *Townsend* language to the effect that:

 . . . the principle that accords substantial weight to interpretation of

a statute by the department entrusted with its administration is inapplicable insofar as those regulations are inconsistent with the requirement of § 402(a)(10) that aid be furnished "to *all eligible* individuals." (Emphasis supplied.) 404 U.S. 286, 92 S.Ct. 502, 30 L.Ed.2d 448.

■ However, the present case is somewhat easier in this regard. Although defendant claims that it gives no AFDC benefits to unborn children,

 . . . defendant does grant AFDC to or for a child between the ages of one day to eighteen years and as incidental to such a grant, pays for the medical expenses of the mother or any other acceptable person caring for such child. Thus, where a mother is caring for her child, who is receiving AFDC, and such mother is pregnant, the defendant pays for her prenatal care. Therefore, the defendant does not grant AFDC to an unborn child, whose mother has another living child in her household but instead grants AFDC to a child who is living outside of his mother's womb and pay [sic] for prenatal care of the pregnant mother caring for her child receiving AFDC, as incidental to such a grant of AFDC. Defendant's Brief at 30.

The internal inconsistency of this argument is apparent, because, under New Hampshire's AFDC program, pregnant

16. Even if defendant did deny AFDC benefits to all unborn children, the legislative history of the Social Security Act will show that the term "dependent child" includes all unborn children. *See* notes 29–39 *infra* and accompanying text. *See also* Wilson v. Weaver, 358 F.Supp. 1147 (N.D.Ill.1972) ; Alcala v. Burns, 362 F.Supp. 180 (S.D.Iowa1973) ; Doe v. Lukhard, 363 F.Supp. 823 (E.D.Va.1973).

17. Wilson v. Weaver, 358 F.Supp. 1147 (N.D.Ill.1972) ; Alcala v. Burns, 362 F.Supp. 180 (S.D.Iowa1973) ; Doe v. Lukhard, 363 F. Supp. 823 (E.D.Va.1973) and Parks v. Harden, 354 F.Supp. 620 (N.D.Ga.1973). *See also* Jones v. Graham, Civ. No. 73–1–235 (D. Neb., filed September 5, 1973) ; Murrow v. Clifford, Civ. No. 114–73 (D.C.N.J., filed April 13, 1973) ; Green v. Stanton, 364 F. Supp. 123 (N.D.Ind.1973) ; Harris v. Mississippi, 363 F.Supp. 1293 (N.D.Miss.1973).

The decision in Alcala v. Burns has been appealed to the Eighth Circuit, and the judgment in Wilson v. Weaver has been stayed pending appeal.

18. I have not seen copies of the Jones, Murrow, Green, or Harris cases mentioned in note 30 *supra*.

19. 45 C.F.R. § 233.90(c)(2)(ii).

20. Wilson v. Weaver, 358 F.Supp. 1147 (N. D.Ill.1972), Alcala v. Burns, 362 F.Supp. 180 (S.D.Iowa1973), and Doe v. Lukhard, 363 F.Supp. 823 (E.D.Va.1973).

21. HEW has long considered extension of AFDC benefits to pregnant women (unborn children) an optional program, in which states may, but need not, participate. *See* Doe v. Lukhard, 363 F.Supp. 823 (E.D.Va. 1973).

women with postpartum children in their households do receive prenatal care which is for the benefit of the unborn child as well as the mother. Since the New Hampshire Department of Welfare has elected to participate in the unborn child program, it is estopped from claiming the nonrecognition of unborn children.[22]

Because defendant's brief proceeded on the mistaken assumption that New Hampshire extends no AFDC benefits to unborn children, its discussion of the Supremacy Clause issue is not on point. Therefore, I assume that the State Welfare Department would maintain the standard posture that:

> . . . the statute merely sets the outer limits of eligibility; that it does not require the states to aid all individuals who might fall within those limits; and that the state is free to write its own narrower standards of eligibility so long as they are constitutional and do not contradict any of the federal standards. Stoddard v. Fisher, 330 F.Supp. 566 (D.Me.1971) at 568.

Plaintiffs' position is simple: an unborn child is entitled to AFDC benefits, whether or not its mother is otherwise childless.

## IV. PRELIMINARY MATTERS

■■ Before delving into the merits of this case, two preliminary matters deserve attention. First, defendant argues that plaintiffs lack standing, both individually and as representatives of their children. Defendant's Brief at 22–24. Since this defense was not pleaded in the answer, as required by Fed.R.Civ.P. 9(a), defendant has technically waived it. But, notwithstanding defendant's waiver, I rule that the pregnant women themselves have standing. The Act clearly contemplates aid to pregnant women. Section 606(b) defines the term "aid to families with dependent children" as including:

> . . . money payments or medical care or any type of remedial care . . . to meet the needs of the relative with whom any dependent child is living. 42 U.S.C. § 606(b)(1).

Moreover, the testimony of Dr. Jacobson establishes that unborn children must have a proper protein diet to insure adequate prenatal development. If a pregnant woman does not ingest enough protein during the gestation period, then the developing fetus will satisfy its needs from the permanent protein stores of the mother's body; and this process can result in the physical deterioration of her muscles and bodily tissues. I find that plaintiffs[23] have a

> . . . "personal stake in the outcome of the controversy," Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), that insures that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution," . . . . Roe v. Wade, 410 U.S. 113, 123, 93 S.Ct. 705, 712, 35 L. Ed.2d 147 (1972).

Next, I consider the impact of three recent Supreme Court cases, which for the sake of simplicity, I shall call the Eligibility Trilogy: King v. Smith, 392

22. Moreover, defendant has not pointed out any HEW regulations which contemplate the distinction sought to be upheld here. *Cf.* 45 C.F.R. § 233.10(a)(1)(ii); 45 C.F.R. § 230.30(a)(1)(ii); 42 C.F.R. § 206. If anything, these regulations support plaintiffs' case. *See* Comment, Welfare's "Condition X," 76 Yale L.J. 1222 (1967).

23. Because I find that plaintiffs have standing individually, I need not reach the question of their capacity to sue as representatives of their unborn children. Since the pregnant women themselves have standing to challenge the State's practice, this case is not inconsistent with the Supreme Court's recent decision in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1972). And this would be so even if the present action does establish standing for unborn children, for even if Roe v. Wade holds that an unborn child is not a "person" for constitutional purposes, we deal here with a legislative enactment. Alcala v. Burns, 362 F. Supp. 180 (S.D.Iowa1973).

U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1972); and Carleson v. Remillard, 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972). Although the cases have been thoroughly explored elsewhere,[24] it is necessary to recite them briefly. In *King*, the Court struck down, as inconsistent with the definition of "parent" in 42 U.S.C. § 606(a), Alabama's "substitute father" regulation.[25] *Townsend* involved a review of Illinois' practice of denying benefits to otherwise needy children between the ages of eighteen and twenty-one who attended a college or university, while granting such benefits to those who attended high school or vocational training institutions. The practice was found to be in conflict with 42 U.S.C. § 606(a)(2)(B).[26] Finally, *Carleson* considered whether California could legally deny AFDC benefits to children of military enlistees under the "continued absence from the home" standard in 42 U.S.C. § 606(a). The court found California could not so discriminate.

Read together, these cases establish that AFDC eligibility standards are federal standards [27] and that:

. . . at least in the absence of congressional authorization for the exclusion clearly evidenced from the Social Security Act or its legislative history, a state eligibility standard that excludes persons eligible for assistance, under federal AFDC standards violates the Social Security Act and is therefore invalid under the Supremacy Clause. Townsend, 404 U.S. at 286, 92 S.Ct. 502 at 505, 30 L.Ed.2d 448.

Some cases have treated the *Townsend* language as binding rule of law. However, the Trilogy and other similar welfare cases really entail a continuing judicial interpretation of the Social Security Act. Inevitably these problems of statutory construction involve resort to the relevant legislative history. The Trilogy, taken in its entirety, sets forth a rule of construction which the Supreme Court has derived and found helpful after considerable experience in the construction and interpretation of the Social Security Act.[28]

24. *See, c. g.*, Wilson v. Weaver, 358 F.Supp. 1147 (N.D.Ill.1972) at 1152–1153, and generally the cases in note 17 *supra*.

25. The regulation denied "AFDC payments to the children of a mother who 'cohabits' in or outside her home with any single or married able-bodied man." *King*, 392 U.S. at 311, 88 S.Ct. at 2130. Since the court construed "parent" to mean one legally liable for a child's support, the regulation was in conflict with the federal standard.

26. In Section 606(a)(2)(B) a "dependent child" is defined, in pertinent part, as a needy child
(2) who is . . . (B) under the age of twenty-one and . . . a student regularly attending a school, college, or university, or regularly attending a course of vocational or technical training designed to fit him for gainful employment;
*See* note 28 *infra*.

27. Carleson v. Remillard, 406 U.S. 598, 600, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972).

28. Read closely, the Trilogy reveals the following:

(a) In *Townsend* the court was presented with a clear conflict between the State practice and the plain language of the Social Security Act itself. Moreover, the legislative history established in a *positive* and clear manner that Congress had considered the *Townsend* problem and elected not to allow the states the option Illinois sought to exercise.

(b) In *King* the statutory language itself was unhelpful, but there again the court pointed to several *positive* legislative decisions which implied that Congress had intended to proscribe the interpretation of the word "parent" that Alabama sought to have applied.

(c) *Carleson* presents a more difficult problem because of the brevity of the opinion. Nonetheless, the opinion proceeds from the *positive* position that denial of benefits would be inconsistent with the policies underlying the Social Security Act.

These cases are then a culmination of over thirty-five years of Supreme Court familiarity with the evolution of the Social Security Act. Based on this experience, the Court has cogently facilitated judicial approach to new problems in this area. *See* Parks v. Harden, 354 F.Supp. 620 (N.D.Ga.1973).

## VI. THE MERITS

I now turn to the merits of plaintiffs' claim. Section 402(a)(10) of the Social Security Act, 42 U.S.C. § 602(a)(10), provides that "aid to families with dependent children shall be furnished with reasonable promptness to *all eligible individuals*," [Emphasis added.] and § 606(a) defines a "dependent child" as:

. . . a needy child (1) who has been deprived of parental support or care . . . and who is living with [one of the several enumerated relatives], and (2) who is (A) under the age of eighteen, or (B) under the age of twenty-one and . . . a student regularly attending a school, college, or university, . . . . 42 U.S.C. § 606(a).

The narrow question for consideration here is whether or not New Hampshire's practice of denying the unborn children of otherwise childless women AFDC benefits conflicts with the Social Security Act and is, therefore, illegal under the Supremacy Clause [29] of the Constitution. Cast in these terms, the problem is the familiar one of statutory interpretation: Does the phrase "dependent child," as used in the Social Security Act, include the unborn children of otherwise pregnant women?

Turning first to the words of the statute, one finds no help.[30] Although Mr. Webster does define "child" as "an unborn or recently born human being," [31] the language of the Act is as susceptible of defendant's interpretation as it is of plaintiffs'.

In any event, the Court does not find this venture into the plain meaning of the term "dependent child" extremely fruitful. . . . It is ascertainable, however, that an "unborn child" is not specifically excluded by the language of the Act. Alcala v. Burns, 362 F.Supp. 180 (S.D.Iowa 1973) at 6.

Diligent research by both counsel and the court reveals that the legislative history bespeaks no specific intent on the part of Congress in respect of either the exclusion or the inclusion of the unborn child.

Thus, Congress, as it frequently does, has voiced its wishes in muted strains and left it to the courts to discern the theme in the cacophony of political understanding. Rosado v. Wyman, 397 U.S. 397, 412, 90 S.Ct. 1207, 1218, 25 L.Ed.2d 442 (1970).

I turn, therefore, to a search of the legislative pronouncements which have surrounded the enactment and continuing amendments to the Social Security Act to see if I can "discern the theme" of Congressional intent.

The legislative history does show a continuing concern for the development and well-being of children whose parents are unable to take care of them. Although the original definition [32] of "dependent child" is as ambiguous as its present-day counterpart, the pronounce-

---

29. Article VI, Clause 2, of the Constitution provides:

This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding.

30. Defendant's assertion "that the procedural provisions of § 602 are mandatory while those of § 606 are optional with the states is simply unsupported by the language of the statute." Wilson v. Weaver, 358 F.Supp. 1147 (N.D.Ill.1973) at 1153–1154.

31. Webster's Third New International Dictionary (1969).

32. The original definition reads:

Sec. 406. When used in this title—

(a) The term "dependent child" means a child under the age of sixteen who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, or aunt, in a place of residence maintained by one or more of such relatives as his or their own home; . . . . 42 U.S.C. § 606, 49 Stat. 629 (1935).

ments surrounding the passage of the original Social Security Act in 1935 reveal the following:

> In title V it is proposed that aid be given the States for other services very essential to the security of children. The first of these is aid for maternity and infancy welfare . . . . The need for such services has increased with the depression, and the fact that the maternal mortality rate in this country is much higher than in nearly all other progressive countries is certainly not to our credit. Committee on Ways and Means Report, H.R.Rep.No.615, 74th Cong., 1st Sess. 12 (1935). *See also* S.Rep. No.628, 74th Cong., 1st Sess. (1935).

Even the minority views recognized that

> [f]or years our Government has extended aid to the States to provide for maternal and child welfare. Title V continues this aid in an increased amount. Committee on Ways and Means Report, H.R.Rep.No.615, 74th Cong., 1st Sess. 42 (1935). *See also* S.Rep.No.628, 74th Cong., 1st Sess. (1935).

Moreover, the enacting Congress of 1935 clearly expected the Act to be molded and developed by future legislatures,[33] and with a major piece of social legislation, such as the Social Security Act, it is appropriate to look at the later Congressional pronouncements as indicative of an evolving legislative intention.

Later Congressional solicitude for a wide variety of child welfare problems is a leitmotif running throughout the legislative history surrounding the amendments to the Social Security Act. That the legislators who passed the 1950

amendments were concerned with early treatment of childhood problems in the hopes of preventing later more costly and less effective treatment is clear.[34] And this same concern was reiterated in the passage of the children's disability provisions in 1956.[35] The 1962 amendments demonstrate the ongoing serious attention given this area by Congress. In an attempt to clarify the intended scope of coverage, the House Report covering the 1962 amendments defined the term "child welfare services" to mean:

> . . . public social services which supplement, or substitute for, parental care and supervision for the purpose of (1) preventing or remedying, or assisting in the solution of problems which may result in the neglect, abuse, exploitation, or delinquency of children; . . . . S.Rep.No. 2133, 87th Cong., 2d Sess. (1962) reported in 1962 U.S.Code Cong. and Adm.News p. 1959; *see also* H.R.Rep. No. 1414, 87th Cong., 2d Sess. (1962).

In addition, the Committee recognized the continuing need for further expansion of aid in this area:

> Much more remains to be done before the children in our Nation can be assured of receiving these *preventive* and *protective* services when they are needed. [Emphasis added.] S.Rep. No.2133, 87th Cong., 2d Sess. (1962) reported in 1962 U.S.Code Cong. and Adm.News p. 1957; *see also* H.R. Rep.No.1414, 87th Cong., 2d Sess. (1962).

More recently, the legislative history indicates a concern with early detection of mentally and physically crippling childhood problems.[36] Beginning in 1963,

---

33. Committee on Ways and Means Report, H.R.Rep.No.615, 74th Cong., 1st Sess. 16–17 (1935).

34. The Senate Finance Committee noted that: Unmet health and welfare needs of children, if ignored too long, may necessitate expensive and less effective treatment later.
S.Rep.No.1669, 81st Cong., 2d Sess. (1950) reported in 1950 U.S.Code Cong.Serv. p. 3348.

35. S.Rep.No.2133, 84th Cong., 2d Sess. (1956) reported in 1956 U.S.Code Cong. and Admin. News, pp. 3878, 3881–82. *See also* H.R.Rep. No.1189, 84th Cong., 2d Sess. (1956).

36. S.Rep.No.404, 89th Cong., 1st Sess. (1965), reported in 1965 U.S.Code Cong. and Adm. News pp. 2026, 2029–34. *See also* H.R.Rep. No.213, 89th Cong., 1st Sess. (1965).

Congress established new programs for maternity and infant care in low income areas.[37]

. . . States use Federal funds, together with State and local funds, to pay the costs of conducting prenatal and postpartum clinics where mothers may receive family planning services if they wish them; for visits by public health nurses to homes before and after babies are born to help mothers care for their babies; for well-child clinics where mothers can bring their babies and young children for examination and immunizations, where they can get competent advice on how to prevent illnesses and where their many questions about the care of babies can be answered. Such measures have been instrumental in the reduction of maternal and infant mortality, especially in rural areas. Funds are used to make doctors, dentists, and nurses available to schools for health examinations, and they are also used for immunizations. These funds support 134 mental retardation clinics in 50 States where over 30,000 children received diagnostic treatment and counseling services last year. S.Rep. No. 744, 90th Cong., 1st Sess. (1967), reported in 1967 U.S.Code Cong. and Adm.News p. 3031; see also H.R.Rep. No.544, 90th Cong., 1st Sess. (1967).

Family planning services were also established at that time and have continued to the present.

The maternity and infant care projects promote public understanding of the importance of prenatal care in low-income neighborhoods, employ case finding methods . . . to find patients early in pregnancy, establish neighborhood clinics affiliated with hospitals, provide prenatal care, nutritional advice, homemaker services, public health nursing, and social services; and pay for hospital care for mothers and infants in hospitals staffed to give the quality of services high risk patients need. It is these programs that have opened the door to family planning services for thousands of low-income families for the first time. Because the brief period of pregnancy is too short a time in which to detect and correct all the factors adversely affecting the outcome of pregnancy, continuing health supervision for mothers who had complications of pregnancy is essential. This makes it possible to improve the health of mothers for a subsequent pregnancy and to begin prenatal care early. It is also essential to provide periodic medical examinations for women who are receiving family planning services. S.Rep.No.744, 90th Cong., 1st Sess. (1967), reported in 1967 U.S.Code Cong. and Adm.News p. 3034; see also H.R.Rep.No.544, 90th Cong., 1st Sess. (1967).

The 1972 amendments included a section which clearly would have denied AFDC benefits to all unborn children.[38] That amendment was deleted before passage. From Congress' failure to pass this amendment, both sides derive support for their respective positions. This inaction shows (as does the earlier history discussed above) at least that Congress was aware of the practice of extending AFDC benefits to unborn children. Beyond that, it is inappropriate to speculate; and in any event, the failure to act supports, at most, Congress' desire to leave intact the flexible HEW policy. But, as I have suggested above, the optional feature of the entire unborn child program is not in issue in this case.

This history certainly demonstrates that through the years, Congress has been acutely aware of the critical nature of prenatal care and, indeed, has urged the states to expand the scope of their programs in this area. I cannot fairly and objectively conclude from this re-

---

37. S.Rep.No.744, 90th Cong., 1st Sess. (1967), reported in 1967 U.S.Code Cong. and Admin. News, p. 3029. See also H.R.Rep.No.544, 90th Cong., 1st Sess. (1967).

38. See H.R.Rep.No.92–231, 92nd Cong., 2nd Sess. 184 (1972); S.Rep.No.92–1230, 92nd Cong., 2d Sess. 108 (1972).

view of Congress' treatment of the dependent child that there is "clearly convincing evidence" of an intent to exclude either unborn children as a group or unborn children of otherwise childless women.

## VII. SUMMARY

The Social Security Act was designed as "a measure which will benefit the entire public." [39] In order to qualify for matching federal funds in the administration of programs promulgated under the Act, a state must conform its eligibility standards to the policies underlying the Act.[40] As noted above, one major continuing Congressional concern has been the development and expansion of prenatal care programs. This policy is inconsistent with the exclusion of unborn children from the definition of "dependent children" and the consequent denial of AFDC benefits to pregnant women, whether otherwise childless or not.

Moreover, although it is not necessary to consider plaintiffs' Fourteenth Amendment claim, "there is a serious question of whether the [New Hampshire] classification can withstand the strictures of the Equal Protection Clause." *Townsend*, 404 U.S. at 291, 92 S.Ct. 502 at 508, 30 L.Ed.2d 448. The defendant attempts to justify its classification on several grounds: (a) that otherwise childless women will be more likely to work and become self-sufficient and place their children for adoption where they have "a better chance of becoming worthy citizens through proper upbringing," (b) that distribution of AFDC benefits will discourage marriage, and (c) that "[t]his would place

many more mothers on the defendant's AFDC payrolls than otherwise would receive AFDC and become a tremendous additional expense to the State of New Hampshire." Defendant's Brief at 33. Without considering these justifications in detail, it seems highly questionable that they provide a rational basis for the State's classification. It is undisputed that these plaintiffs are needy. They qualify for AFDC in all respects save that their children are unborn. Moreover, the worthy person concept of welfare eligibility has been thoroughly discredited. *King*, 392 U.S. at 320–325, 88 S.Ct. 2128, 20 L.Ed.2d 1118. New Hampshire's concern with improving its citizenry and encouraging parental responsibility [41] "may be protected by other means." *King*, 392 U.S. at 334, 88 S.Ct. at 2142. And finally,

> . . . a State's interest in preserving the fiscal integrity of its welfare program by economically allocating limited AFDC resources may not be protected by the device of adopting eligibility requirements restricting the class of children made eligible by federal standards. That interest may be protected by the State's "undisputed power to set the level of benefits . . . ." *Townsend*, 404 U.S. at 291, 92 S.Ct. 502, at 508, 30 L.Ed.2d 448.

I cannot

> . . . assume that Congress, at the same time that it intended to provide programs for the economic security and protection of *all* children, also intended arbitrarily to leave one class of destitute children entirely without meaningful protection. . . . Such an interpretation of congression-

---

39. H.R.Rep.No.615, 74th Cong., 1st Sess. 16 (1935).

40. Stoddard v. Fisher, 330 F.Supp. 566, 571–572 (D.Me.1971).

41. I assume that defendant's concern over discouraging marriage is corollary to its goal

of encouraging parental responsibility. However, the Act provides a specific mechanism for the accomplishment of this goal. 42 U.S.C. §§ 602(a)(17), (21), and (22). *See* King v. Smith, 392 U.S. 309 at 330–333, 88 S.Ct. 2128, 20 L.Ed.2d 1118.

al intent would be most unreasonable, and . . . [I] decline to adopt it. *King*, 392 U.S. at 330, 88 S.Ct. at 2140, 20 L.Ed.2d 1118. *See Carleson*, 406 U.S. at 604, 92 S.Ct. 1932, 32 L.Ed.2d 352.

This case closely parallels many of the recent welfare decisions. It follows directly from the Eligibility Trilogy and is strikingly similar, if not on all fours, with the approach taken in Stoddard v. Fisher, 330 F.Supp. 566 (D.Me.1971). In *Stoddard* otherwise needy families of military enlistees challenged Maine's practice of denying them AFDC benefits, while distributing such benefits to families of military draftees. In holding the practice illegal, the court concluded that, as in *King*,

. . . a conflict existed because the Congressional purpose underlying the statute was to assist all needy children who met the federal standards of eligibility. By imposing a more restrictive standard, . . . [the State] prevented some families, eligible under the federal statute, from receiving benefits. This, the Court determined, violated the broad purpose of the Social Security Act. 330 F.Supp. at 570.

What we have here is an exclusionary state practice which is not supported by the HEW regulations, which does not comport with the underlying policy of the statute, and most importantly, which cannot withstand scrutiny under the relevant Supreme Court decisions.

## VIII. RELIEF

New Hampshire's practice of denying AFDC benefits to otherwise childless pregnant women is in conflict with the Social Security Act and, therefore, violates the Supremacy Clause. Plaintiffs are entitled to a permanent injunction enjoining defendant from denying them AFDC benefits on this basis. Plaintiffs also request, as retroactive damages, an award of all monies wrongfully withheld from them and a finding that this action may proceed as a class action under Rule 23, Fed.R.Civ.P.

I treat the request for retroactive damages first.

Because victory on the major substantive issues was of primary importance in the early years of welfare litigation, the remedial appropriateness of retroactive benefit orders by federal courts was seldom questioned, and such awards frequently were made as a matter of course. 26 Vand.L.Rev. 633, 635 (1973).

Recently, however, many of the substantive issues have been resolved, and judicial focus is shifting to the propriety of retroactive awards.[42]

Conceptually there are two barriers to the award of retroactive benefits in welfare cases: (a) the limits of judicial power under the Eleventh Amendment (sovereign immunity) and (b) the equitable propriety of such relief. Of the cases that have dealt with the issue, most have focused on the sovereign immunity question.[43] Although I need not reach this question,[44] and for that rea-

---

42. *See* Rothstein v. Wyman, 467 F.2d 226 (2d Cir. 1972), *cert. denied,* 411 U.S. 421, 93 S.Ct. 2276, 36 L.Ed.2d 966 (1973), and Dawkins v. Craig, 483 F.2d 1191 (4th Cir. 1973), which have denied retroactive benefits, and Jordan v. Weaver, 472 F.2d 985 (7th Cir. 1973), *cert. granted sub nom.* Edelman v. Jordan, 412 U.S. 937, 93 S.Ct. 2776, 37 L.Ed.2d 398 (1973), which allowed retroactive benefits. All three cases involved challenges to state welfare eligibility standards. *Dawkins* involved very nearly the issue presented here. Several district courts have also dealt with the issue. Of the cases involving AFDC

benefits to pregnant women, *see* notes 17 and 18 *supra,* only Wilson v. Weaver awarded retroactive benefits. *Cf.* Westbury v. Fisher, 309 F.Supp. 12 (D.Me.1970). Since certiorari has been granted in Jordan v. Weaver, the issue should soon be resolved.

43. *See* cases cited in note 42 *supra.* Only *Rothstein* considered the question of judicial discretion in any detail.

44. It may well be inappropriate for a single judge to decide a constitutional issue of this nature. *See* notes 6–9 *supra,* and accompanying text. Although it is now clear that a

son express no opinion on the merits, it should be noted that "[t]he traditional doctrine of sovereign immunity has been subjected to vigorous criticism, and that criticism is no less justified when the doctrine is embodied in the form of the Eleventh Amendment." [45] Moreover, the possible ramifications of completely foreclosing a remedy in this area are serious.

> . . . [W]hen viewed broadly, [a decision based on the Eleventh Amendment would] foreclose[s], in any nonconsensual suit by an individual, a federal court judgment that requires the payment of money from state funds. In an era when the recognition of constitutional rights by federal courts increasingly requires the allocation of public resources, this interpretation would often render plaintiffs remediless in suits challenging allegedly unlawful state practices; and, by protecting unconstitutional "state action" from the full judicial power of the United States, the court's holding ultimately sets up the eleventh amendment in opposition to the fourteenth.[46]

▆ I turn to the question of whether, under the equitable power of this court, plaintiffs are entitled to an award of retroactive AFDC benefits. Because "public assistance programs of the kind in question here reflect a 'scheme of cooperative federalism,'" Rothstein v. Wyman, 467 F.2d 226, 232 (2d Cir. 1972),

cert. denied, 411 U.S. 421, 93 S.Ct. 2276, 36 L.Ed.2d 966 (1973), consideration must be given to the "potential for serious strain in the federal structure inherent in a grant program of great magnitude and complexity," Rothstein, 467 F.2d 236, as well as to the plight of individual welfare litigants.[47] Since it is clear that Congress gave the states considerable latitude in the development of their welfare programs, Rothstein, 467 F.2d at 235, King, 392 U.S. at 318–319, 88 S.Ct. 2128, 20 L.Ed.2d 1118, the federal interest in court-ordered retroactive benefits is limited basically to the furtherance of three policies: [48] (1) deterrence of willful violations of federal standards by state agencies; (2) protection of the federal fisc; and (3) satisfaction of the needs of persons entitled to welfare. The first policy is not implicated in this case. Plaintiff has not alleged, and it does not appear, that defendant has acted in bad faith in denying the AFDC benefits.[49]

Although the federal government does have an interest in overseeing the proper use of granted funds, the fact that Congress has provided a mechanism for termination of federal grants to nonconforming state programs indicates that the federal courts should exercise great restraint in this area. See Mitchum v. Foster, 407 U.S. 225, 243, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1973). Moreover, the practicalities of the case indicate that since it "would be unthinkable to order

---

single judge can decide the merits of a federal statutory challenge to state welfare practices, it is not clear that an order which directly awards retroactive benefits is appropriate. All of the earlier Supreme Court cases which affirmed judgments awarding retroactive payments without discussing the issue had been decided by three-judge courts in the first instance. See, e. g., Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and the cases cited in Jordan v. Weaver, 472 F.2d at 989. I note additionally that in its remand to this court, the three-judge court specifically limited my jurisdiction to "nonconstitutional questions." Order of September 19, 1973.

45. 26 Vand.L.Rev. 633, 642 (1973). See also W. Prosser, Torts (4th Ed. 1970) at 984.

For a good discussion of the historical development see Dawkins v. Craig, 483 F.2d 1191 (4th Cir. 1973).

46. 26 Vand.L.Rev. 633, 641 (1973).

47. 26 Vand.L.Rev. 633, 640 (1973).

48. Rothstein v. Wyman, 467 F.2d at 233–235.

49. States are allowed some measure of freedom in the administration of the Act. Faced with the complex scheme of federal controls, defendant has understandably denied these benefits under the impression that HEW had characterized them as optional. See Doe v. Lukhard, 363 F.Supp. 823 (E.D.Va.1973).

welfare recipients who received federal money under an illegal state program to return their checks," *Rothstein*, 467 F. 2d at 235, reimbursement to the federal government would have to come from the states. The increase in federal-state tension caused by such a precedent is unnecessary and unwarranted in light of the Congressional solicitude for state welfare administration.

■ The third federal policy, that of satisfying needy individuals, coincides, and will be considered along with, the position of the individual welfare litigants in this controversy. In balancing the equities between the pregnant women on the one hand and the state and federal governments on the other, it should be noted that the policy underlying the Social Security Act is basically remedial, not compensatory. Here, both plaintiffs have already had their babies,[50] and the type of aid [51] contemplated by this case is no longer appropriate. Moreover, an award of retroactive benefits would deny current recipients of needed funds.

Finally, it is clear that denial of retroactive benefits would further the interests of the State of New Hampshire.[52]

■ For the above-stated reasons, plaintiffs' request for payment of retroactive AFDC benefits is denied. However, based on the conflict with the Social Security Act, a permanent injunction, restraining defendant from further pursuing its practice of denying AFDC benefits to otherwise qualified pregnant women, will issue. In view of these rulings, it is unnecessary that this action proceed as a class action or that the several motions to intervene be granted.[53] The motions to intervene and to proceed as a class action are, therefore, denied.

So ordered.

50. Although the birth of plaintiffs' children does not render this action moot, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 2d 147 (1973) at 124–125, it does point to the impropriety of awarding retroactive benefits.

51. The type of aid contemplated here is mainly nutritional and medical.

52. *See* note 41 *supra*, and accompanying text.

53. *See* Wilson v. Weaver, 358 F.Supp. 1147 (N.D.Ill.1972) at 1151–1152.